UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STEVEN GUY WELTY,

                Petitioner,

    v.

RON HAYNES,

                Respondent.

CASE NO. 3:19-cv-05734-RJB-JRC

REPORT AND RECOMMENDATION

NOTED FOR:  April 24, 2020

The District Court has referred this petition for a writ of habeas corpus ("the petition") to United States Magistrate Judge J. Richard Creatura. Petitioner filed the petition pursuant to 28 U.S.C. § 2254.

The Court concludes that the petition was filed after the statute of limitations. Although petitioner contends that he is entitled to statutory tolling of the limitations period due to the filing of his personal restraint petitions, the time that is tolled is not enough to make this petition timely. In addition, petitioner has not demonstrated extraordinary circumstances which prevented him from timely filing the petition warranting equitable tolling or actual innocence. Therefore, the Court recommends that the petition be dismissed with prejudice as time-barred.

1

**STATEMENT OF THE CASE**

2      On November 16, 2010, petitioner was found guilty in Clallam County Superior Court by

3   bench trial of six counts of first-degree rape of a child, six counts of first-degree child

4   molestation, and six counts of first-degree incest. Dkt. 11, Exhibit 1.

5      The Court refers to the parties' initials in order to protect privacy. The Washington Court

6   of Appeals summarized the evidence presented at trial of petitioner's sexual abuse of EG, the

7   uncharged sex offenses he committed many years earlier against his daughter AG and his sister

8   RP, and the recorded phone calls in which petitioner acknowledged having committed the

9   offenses against EG:

10

11          Every year from the time she was 4 until she was 11, EG and her older
brother visited Welty, their grandfather, during their spring and winter vacations.

12      According to EG, Welty first sexually abused her when she was 4. Around 5:30 or
6:00 am, after Welty's wife left for work, Welty took EG out of the guest room in

13      which she and her brother slept and into his bedroom. Once there, Welty placed her
in his bed, removed her pants, touched her chest area and vagina with his hands

14      and his mouth, kissed her with his tongue, and performed oral sex on her. EG tried
to scoot away, but Welty grabbed her legs and told her that he loved her and that

15      she should not tell anyone.

16          Each subsequent year, during every visit, Welty sexually abused EG in
the same manner. During each incident, Welty always performed oral sex on EG.

17      Additionally, when EG was 7 years old, Welty grabbed her hands, put them down his
pants, and made her touch his penis. When EG was 11, Welty stopped abusing her

18      after he approached her and she told him that she was sleeping and he should stop
and go away.

19          Initially, EG did not disclose Welty's sexual abuse to anyone because she
felt she had done something wrong. When she was in sixth grade, EG disclosed

20      the abuse to her brother because she needed to tell someone, but was afraid to tell
her parents. According to EG's brother, she told him through tears that Welty was a

21      "bad man" and that, during visits with Welty and while EG's brother slept,
Welty would take her into his bedroom and touch her. Report of Proceedings (RP)

22      (Oct. 5, 2010) at 345. EG told her brother not to share her disclosure with their
parents.

23

24

At age 14, EG felt strong enough to disclose Welty's sexual abuse to her mother, AG. Before her disclosure, EG was unaware that Welty had also sexually abused AG as a child. According to AG, Welty first began abusing her when she was 3. She recalled getting into bed with Welty, where he encouraged her to touch his erect penis.

Around age 4 or 5, after her parents divorced, Welty picked up AG for visitation. During the drive, Welty pulled over to the side of the highway; performed oral sex on AG while in his car; and told AG that it was their "special time," that he loved her, and that she should not tell anyone. RP (Oct. 4, 2010) at 45. AG disclosed Welty's conduct to her mother. AG recalled that "there was a phone call made, but nothing really happened." RP (Oct. 4, 2010) at 45. When AG next saw Welty, he scolded her for disclosing what he did and told her that she would not get to see him again and that it was supposed to be their secret.

Subsequently, AG visited Welty during summers and at Christmas. RP (Oct. 4, 2010) at 45. During these visits, Welty would "quite often" abuse AG by performing oral sex on her, having her touch him, kissing her with his tongue, or having her climb on top of him and "rub on him." RP (Oct. 4, 2010) at 46, 48. Welty performed oral sex on her during every incident of abuse, which continued until AG was 13.

EG also did not know until after her disclosure that Welty had abused his younger sister, RP, when they were children. According to RP, she slept in a bedroom with her brothers as a child. Because she did not have a bed of her own, she alternated sharing beds with her brothers. Between the ages of 6 and 10, RP frequently would awaken during the middle of the night with Welty licking her "bottom," clitoris, and vaginal opening. RP (Oct. 4, 2010) at 25.

AG contacted law enforcement. After obtaining court authorization, on July 26, 2010, law enforcement recorded three telephone conversations between AG and Welty. During th first call, AG confronted Welty with EG's disclosures. When Welty denied sexually abusing EG, AG questioned his sincerity because EG's descriptions of the abuse were almost identical to his abuse of AG.

During the second call, Welty stated:

> I didn't mean for anything to happen . . . it became a playful time, and it just happened to just come into play, and I don't know why. And I have apologized to [EG] over and over again . . . whatever you decide to do, you know, you gotta do it. That means if I spend the next 10, 15 years in jail, that's what I gotta do. If my family has to know about it, then that's what I gotta do. And I will certainly seek help. . . .

> I was loving her, and it went too far. . . .
>
> [EG] used to come in and jump in bed with me . . . . pinching my boob, she was also pinching my titties. You know, she even does it now. And so, you know, it became blowing on my belly and, and blowing on her belly and . . . all of a sudden it just went too far.

He further stated:

> I'm telling you right now that I have done a detestable thing, it is the, it is wrong and I know it, and if I could, if I could just end my life right now and just end it and take care of it, so that I, so that it doesn't have to be out there no more, you know, I would. . . .
>
> I have always expressed my love in a, in a weird way. And you know that. I never hurt you, I never, I never intended on hurting you. I love you, I've loved you forever. And it's, I'm not saying it's right, but it's something that has caused me to want to share a love and with [EG] I have no idea why it came about.

When pressed for details, Welty admitted coaxing EG out of her bedroom and into his bedroom; blowing on EG's belly; and touching her "bottom" "a couple of times"; but he denied ever performing oral sex on her. He also stated he did not remember whether he had ever forced EG to touch his penis.

During the third call, Welty admitted that he forced EG to "touch [him]," that he performed oral sex on her, and that he touched EG "down there" with his fingers, but he was unsure whether he had ever kissed her with his tongue. He also denied breaking her hymen, stating that he did not touch "that part," but "just kissed it." But he also claimed that he could not remember all the details because he had tried to put the incidents out of his mind, to forget them, and to "pray [them] away."

Also pursuant to court authorization, on August 3, 2010, law enforcement recorded a telephone conversation between EG and Welty. When EG asked Welty why he had sexually abused her, he claimed that he did not know why, that "[i]t just got out of hand," and that he had sought psychiatric help.

The State charged Welty with six counts of first degree rape of a child, six counts of first degree child molestation, and six counts of first degree incest. After his arrest, Welty made a recorded telephone conversation from jail to his wife, Debbie Welty. He stated:

> [God] was givin me some scriptures today in Daniel um how Daniel became you know with indignant towards the uh the king and and Shadrack was shackin the bed with a whore, when he had an eye at and I and uh had an eye. They chose not to serve man, but

1
2

>they chose to serve God and they were delivered out of the depths of their filth, you know. So, with all of that, I really do have faith and God is gonna do what he's gonna do.

3
4
5
6

>When Debbie confronted Welty about "defil[ing] [their] house, [their] bed, [and their] marriage," Welty replied, "I never wanted to let you down. It wasn't me that let you down, it was the sin in me that let you down." When Debbie asked whether Welty was going to go to trial and force EG to testify despite Welty's admissions during the previously recorded telephone conversations, he stated that he did not think EG would go through with testifying and that he did not say "much" during those conversations.

7    Dkt. 11, Exhibit 11 at 2-6.

8        The trial court admitted the recordings and transcripts of petitioner's phone conversations

9    with E.G., A.G., and his wife Debbie. Dkt. 11, Exhibit 11 at 6. The court found petitioner guilty

10   of all charges and subsequently entered written findings of fact and conclusions of law. Dkt.11,

11   Exhibits, 2, 11.

12                                     **BACKGROUND**

13   **1.  Direct Appeal**

14       Petitioner, through counsel, filed a direct appeal raising five assignments of error. Dkt.

15   11, Exhibit 4. He also filed two *pro se* statements of additional grounds for review. Dkt. 11,

16   Exhibits 6, 8. On August 8, 2012, the Washington Court of Appeals issued an unpublished

17   opinion affirming petitioner's convictions. Dkt. 11, Exhibit 11.

18       On September 10, 2012, petitioner filed a "Motion to Review Opinion of Appeals Court

19   in Division II." Dkt. 11, Exhibit 12. The state court construed the motion as a motion for

20   reconsideration, but the motion was untimely under RAP 12.4(b). *Id.* Thus, no action was taken

21   by the state court. *Id.* RAP 12.4(b) ("[t]he party must file the motion for reconsideration within

22   20 days after the decision the party wants reconsidered is filed in the appellate court[]").

23
24

1   Petitioner did not file a petition for review with the Washington Supreme Court, and the

2   Washington Court of Appeals issued its mandate on September 24, 2012. Dkt. 11, Exhibit 13.

3          On October 18, 2012, petitioner filed a *pro se* motion to recall the mandate and reinstate

4   his appeal. Dkt. 11, Exhibit 14. On December 20, 2012, the Washington Court of Appeals

5   denied the motion to recall the mandate. Dkt. 11, Exhibit 15. On January 25, 2013, petitioner

6   filed a *pro se* motion for discretionary review before the Washington Supreme Court, moving

7   to reinstate his direct appeal. Dkt. 11, Exhibit 16. On March 4, 2013, the commissioner of the

8   Washington Supreme Court denied discretionary review. Dkt. 11, Exhibit 18. Petitioner did not

9   file a motion to modify the commissioner's ruling.

10          **2.   First Personal Restraint Petition ("PRP")**

11         On April 15, 2013, petitioner filed a *pro se* motion to vacate his convictions with the

12  Clallam Bay Superior Court under CrR 7.8. Dkt. 11, Exhibit 19. The superior court transferred

13  the motion to the Washington Court of Appeals pursuant to CrR 7.8(c)(2) for treatment as a PRP.

14  Dkt. 11, Exhibit 20. On January 22, 2014, the Washington Court of Appeals addressed each of

15  petitioner's claims and dismissed the first PRP. Dkt. 11, Exhibit 24.

16         Petitioner sought discretionary review by the Washington Supreme Court. Dkt. 11,

17  Exhibit 25. On December 24, 2014, the commissioner of the Washington Supreme Court

18  dismissed the claims and denied discretionary review. Dkt. 11, Exhibit 28. Petitioner filed a

19  motion to modify the commissioner's ruling, which the Washington Supreme Court denied

20  without comment on March 4, 2015. Dkt. 11, Exhibits 29, 30. The Washington Court of Appeals

21  issued a certificate of finality on March 18, 2015. Dkt. 11, Exhibit 31.

22          **3.   Second PRP**

23         On September 15, 2015, petitioner filed a second motion under CrR 7.8 with the Clallam

24

County Superior Court to vacate his conviction, which the court transferred to the Washington Court of Appeals to be treated as a PRP. Dkt. 11, Exhibits 32, 33. The Washington Court of Appeals dismissed the second PRP as time-barred under RCW § 10.73.090 and as successive under RCW § 10.73.140. Dkt. 11, Exhibit 39.

Petitioner filed a motion for discretionary review with the Washington Supreme Court. Dkt. 11, Exhibit 42. The commissioner of the Washington Supreme Court denied discretionary review. Dkt. 11, Exhibit 43. Petitioner did not move to modify the commissioner's ruling. On September 27, 2016, the Washington Court of Appeal issued a certificate of finality. Dkt. 11, Exhibit 44.

### 4. Third PRP

On March 6, 2017, petitioner filed a motion directly with the Washington Supreme Court entitled "Motion to Submit Petition for Good Cause to Vacate Judgment and Sentence Remanding for New Trial Showing New Evidence of Constitutional Violations." Dkt. 11, Exhibit 45. The motion was transferred to the Washington Court of Appeal as a PRP. Dkt. 11, Exhibit 46. The Washington Court of Appeals dismissed the third PRP as untimely. Dkt. 11, Exhibit 47. Petitioner filed a motion for discretionary review with the Washington Supreme Court, which was denied. Dkt. 11, Exhibits 48, 49. Petitioner did not move to modify the commissioner's ruling and the Washington Court of Appeals issued a certificate of finality on January 31, 2018. Dkt. 11, Exhibit 49, 50.

### 5. Fourth PRP

On May 14, 2018, petitioner filed a petition entitled "Habeas Corpus/Mandamus Petition of Steven G. Welty – Petition for Relief" directly with the Washington Supreme Court. Dkt. 11, Exhibit 51. The petition was transferred to the Washington Court of Appeals as a PRP. Dkt. 11,

Exhibit 52. The Washington Court of Appeals dismissed the PRP as time-barred. Dkt. 11, Exhibit 55. Petitioner sought review in the Washington Supreme Court. Dkt. 11, Exhibit 56. The Washington Supreme Court denied discretionary review. Dkt. 11, Exhibit 58. The fourth PRP was dismissed as time-barred. Dkt. 11, Exhibit 58. Petitioner filed a motion to modify, which was denied without comment. Dkt. 11, Exhibit 62. The Washington Court of Appeals issued a certificate of finality on August 7, 2019. Dkt. 11, Exhibit 63.

**6. Fifth PRP**

On September 13, 2019, petitioner filed a motion to arrest judgment under CrR 7.8 with the Clallam County Superior Court. Dkt. 11, Exhibit 64. Petitioner argued that the evidence presented at trial was constitutionally insufficient. Dkt. 11, Exhibit 64. The motion was transferred to the Washington Court of Appeals under CrR 7.8(c)(2) as a PRP. Dkt. 11, Exhibit 65. As of the date of respondent's answer, petitioner's fifth PRP is currently pending under case no. 54068-1-II.

**7. Federal habeas petition**

Petitioner filed his federal habeas petition (the "petition") on August 7, 2019. Dkt. 1-1. Petitioner is currently incarcerated at Stafford Creek Corrections Center. *See* Dkt. Petitioner raises five grounds for relief:

1. The affidavit for the warrant to intercept and record petitioner's phone conversations was insufficient;

2. The police violated the warrant authorizing interception of petitioner's phone calls;

3. Ineffective assistance of trial counsel;

4. Structural error and due process violations: The trial court erred in failing to conduct pretrial hearings; and

5.   The police engaged in misconduct when they violated the warrants.

Dkt. 6.

Respondent filed an answer to the petition, asserting that the petition was filed after the statute of limitations period expired. Dkt. 10. Respondent maintains that the petition is time-barred and should be dismissed with prejudice. Dkt. 10. In the alternative, respondent argues portions of petitioner's third ground for relief and the fourth ground for relief are unexhausted and procedurally defaulted and should be dismissed on the merits. *Id.* Petitioner filed a traverse arguing that the petition is timely because he should be entitled to statutory and equitable tolling of the statute of limitations. Dkt. 15.

## EVIDENTIARY HEARING

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id. See Gandarela v. Johnson,* 286 F.3d 1080, 1086–87 (9th Cir. 2001) (holding that, because the affidavits proffered by the petitioner in support of his actual innocence claim "speak for themselves" and petitioner "failed to show what more an evidentiary hearing might reveal of material import on his assertion of actual

1    innocence," the district court had not abused its discretion in finding that an evidentiary hearing

2    was unnecessary), *cert. denied,* 537 U.S. 1117, (2003).

3        The Court finds that it is not necessary to hold an evidentiary hearing in this case because

4    the petition may be resolved on the existing state court record.

5                                   **DISCUSSION**

6        Respondent argues that the petition is untimely. Dkt. 10. Petitioner contends the petition

7    is not time-barred because he is entitled to statutory and equitable tolling. Dkt. 15.

8    **A.  Statute of Limitations - 28 U.S.C. § 2244(d)**

9        The Antiterrorism and Effective Death Penalty Act ("AEDPA") established a statute of

10   limitations for petitions filed by prisoners challenging their custody under a state court judgment

11   and sentence. 28 U.S.C. § 2244(d). Where the challenged judgment became final after April 24,

12   1996, the statute generally begins to run from "the date on which the judgment became final by

13   conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. §

14   2244(d)(1)(A). For purposes of 28 U.S.C. § 2244(d)(1)(A), direct review generally concludes

15   and the judgment becomes final either upon the expiration of the time for filing a petition for

16   writ of certiorari with the Supreme Court, or when the Court rules on a timely filed petition for

17   certiorari.  *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999). The time-period for seeking

18   certiorari is ninety days, according to the Supreme Court Rule 13. *Id.* However, the judgment

19   becomes final on an earlier date where the direct review has terminated prior to reaching the

20   state's highest court. *Gonzalez v. Thaler*, 132 S. Ct. 641, 652-56 (2012); *Wixom v. Washington*,

21   264 F.3d 894 (9th Cir. 2001). If the petitioner never files a timely direct review, the direct review

22   process concludes upon expiration of time for seeking such review, and the judgment becomes

23   final on that date. *Gonzalez*, 132 S. Ct. at 653-54.

24

1    In this case, on direct appeal, the Washington Court of Appeals affirmed petitioner's

2    conviction on August 8, 2012. Dkt. 11, Exhibit 11. Petitioner did not seek review by the

3    Washington Supreme Court, and the judgment became final 30 days later on September 7, 2012.

4    *See* Wash RAP 13.4(a); *See also Wixom*, 264 F.3d at 897-98 (holding that, on direct appeal, it is

5    the decision of the court of appeals affirming the conviction, not the issuance of the mandate,

6    that terminates direct review). The AEDPA limitations period began running on September 8,

7    2012. *See Corjasso v. Ayers*, 278 F.3d 874, 877 (9th Cir. 2002). And, absent statutory or

8    equitable tolling, the statute of limitations would expire one year after that date.

9    **B.  Statutory Tolling**

10    Petitioner argues he entitled to statutory tolling. Dkts. 6, 15. Respondent concedes

11    petitioner is entitled to statutory tolling during his first PRP but argues that petitioner's four

12    subsequently filed PRPs do not toll the AEDPA limitations period. Dkt. 10. If during the

13    limitations period a "properly filed application for state post-conviction or other collateral review

14    . . . is pending," the one-year period is tolled. 28 U.S.C. § 2244(d)(2); *see Pace v. DiGulielmo*,

15    544 U.S. 480, 410 (2005).

16    Here, the AEDPA limitations period ran for 219 days, then, on April 15, 2013 – the date

17    petitioner filed his first PRP – the limitations period tolled pursuant to 28 U.S.C. § 2244(d)(2).

18    Dkt. 11, Exhibit 19. On March 18, 2015 – the date petitioner's first PRP became final – the

19    limitations period resumed. Dkt. 11, Exhibit 31; *see also Corjasso*, 278 F.3d at 879 (finding the

20    statute of limitations remains tolled until the state collateral attack becomes final); *See Carey v.*

21    *Saffold*, 536 U.S. 214, 214 (2002) (The date that a petitioner's state PRP becomes final for the

22    purposes of § 2254(d) is a question of state law.). *Certification from United States Court of*

23    *Appeals, Ninth Circuit in Phonsavanh Phongmanivan v. Haynes,* 458 P.3d 767 (Wash. 2020)

24

(The Ninth Circuit recently certified a question to the Washington Supreme Court, asking whether the date of the Washington Supreme Court's denial of review, or the date stated on the Washington Court of Appeal's certificate of finality is the date that ends statutory tolling. The Washington Supreme Court accepted review and held that the denial of a PRP became final, for purposes of statutory tolling, when certificate of finality was issued.). When his first PRP became final, petitioner had a total of 146 days (for a total of one year) remaining, or until August 11, 2015 to file a timely federal habeas petition. Petitioner did not file the petition until 2019, which was several years after the limitations period expired.

Petitioner filed four more PRPs after the AEDPA limitations period had passed, and one is still currently pending in state court. *See* Dkt. 11, Exhibits 32, 33, 39, 43, 45, 47, 49, 51, 55, 56, 58, 59, 62. However, once the AEDPA limitations period has run, a collateral relief action cannot revive it. *Larsen v. Soto*, 742 F.3d 1083, 1088 (9th Cir. 2013); *Jiminez v. Rice*, 276 F.3d 478, 482 (9th Cir. 2001). Moreover, petitioner's untimely PRPs do not toll the federal statute of limitations because the state courts concluded that the PRPs were untimely under state law, and therefore, cannot be deemed "properly filed." *See* Dkt. 11, Exhibits 32, 33, 39, 43, 45, 47, 49, 51, 55, 56, 58, 59, 62; 28 U.S.C. § 2244(d)(2); *Pace v. DiGuglielmo*, 544 U.S. 408 (2005) (holding that a prisoner's post-conviction petition that was rejected by the state court as untimely was not "properly filed" for purposes of § 2244(d)(2) and the prisoner was not entitled to statutory or equitable tolling of the federal statute of limitations).

Moreover, petitioner's motion for reconsideration and two motions to recall the mandate do not act to toll the limitation period because these pleadings do not constitute a collateral challenge under state law that is subject to statutory tolling. Instead, they were an unsuccessful attempt to reopen petitioner's direct appeal. *See* Dkt. 11, Exhibits 11, 12, 13, 14, 15, 16, 18;

RCW 10.73.090(2) (defining "collateral attack" as "any form of post-conviction relief other than a direct appeal"); *see also Wall v. Kholi*, 562 U.S. 545, 560 (2011) (defining "collateral review" for purposes of § 2244(d)(2) as "judicial review that occurs in a proceeding outside of the direct review process"); *Bryant v. Arizona Atty. Gen.*, 499 F.3d 1056, 1060 n.3 (9th Cir. 2007) (motion to recall mandate directed toward direct review did not toll federal statute of limitations because under § 2244(d)(2) only collateral review proceedings can toll the AEDPA statute of limitations).

### C. Equitable Tolling

The AEDPA statute of limitations is subject to equitable tolling where the petitioner pursued his rights diligently and "some extraordinary circumstance stood in his way." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace*, 544, U.S. at 418). To receive equitable tolling, a petitioner at the very least must show the extraordinary circumstances "were the but-for and proximate cause of his untimeliness." *Ansaldo v. Knowles*, 143 Fed. Appx. 839, 840 (9th Cir. 2005).

Petitioner argues that his petition is subject to equitable tolling based on three "extraordinary circumstances:" (1) officers of the court refused to provide trial transcripts to perfect petitioner's direct appeal and PRP; (2) the Washington Court of Appeals denied petitioner's motion for reconsideration without notifying petitioner that his motion for extension of time and been denied; and (3) the state court refused to rule on constitutional violations brought forth by petitioner even though he has presented evidence showing a clear and egregious violation by Clallam County government seizing petitioner's telephone conversations. Dkt. 15 at 12-13.

Here, petitioner has not asserted any extraordinary circumstances beyond his control that explain his failure to file his federal habeas petition within the AEDPA's one-year statute of limitations period. Further, no such evidence is apparent from the Court's review of the record.

His allegations that the state court refused to provide transcripts and rule on his constitutional claims are simply a reiteration of the grounds for relief raised in this petition. *See* Dkt. 6, 15.

Petitioner also alleges that he was under the mistaken belief that his request for an extension to file a motion for reconsideration with the Washington Court of Appeals on direct appeal had been denied. Dkt. 15 at 12-13. Petitioner contends that he sent a letter to the Washington Court of Appeals prior to the deadline to file a motion for reconsideration, but the court never responded to his letter. *Id.* Petitioner contends that the Washington Court of Appeals denied his request without notifying him. *Id.* According to respondent, there is no entry on the Washington Court of Appeals docket reflecting the receipt of a letter or motion for extension. Dkt. 10 at 7 fn. 9. Mere oversight, miscalculation or negligence on the petitioner's part precludes the application of equitable tolling. *See Waldron–Ramsey v. Pacholke,* 556 F.3d 1008, 1011 (9th Cir. 2009); *Davis v. Haynes,* 2019 WL 7756141, at *8 (W.D. Wash. Nov. 15, 2019), *report and recommendation adopted,* 2020 WL 419493 (W.D. Wash. Jan. 27, 2020) (Even if petitioner miscalculated or was unaware of the deadlines for expiration of the statute of limitations, this does not show a basis for equitable tolling.). And even if true, these allegations do not demonstrate why petitioner failed to file his federal habeas petition before the AEDPA limitations period expired. Thus, petitioner's mistaken belief about an extension to file his motion for reconsideration on direct appeal does not rise to the level of an "extraordinary circumstance" thereby warranting equitable tolling.

And while petitioner alleges that he was diligent in his attempts to his exhaust claims in state court, this also fails to demonstrate he is entitled to equitable tolling. *See* Dkt. 15 at 12-13, 15-16. Rather, the diligence requirement is concerned with whether the petitioner was "diligent in his efforts to pursue his appeal at the time his efforts were being thwarted." *Grant v. Swarthout*, 862 F.3d 914, 923 (9th Cir. 2017) (internal quotations and citations omitted).

1   Essentially, the court expects the petitioner to attempt to resolve any impediment *during* the time

2   which an extraordinary circumstance exists. *See id.* Here, petitioner has not shown that he

3   experienced any extraordinary circumstance sufficient to justify equitable tolling. Therefore, the

4   fact that petitioner expressed concerns about the timeliness of his motion for reconsideration is of

5   little relevance.

6       Petitioner also alleges he has new evidence from the Clallam County Sheriff's Office

7   showing that the detectives did not have consent to enter Mason County to search and seize

8   recording of petitioner's private conversations. Dkt. 15 at 16.

9       "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass

10  whether the impediment is a procedural bar ... [or] expiration of the statute of limitations."

11  *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Lee v. Lampert,* 653 F.3d 929, 934–37

12  (9th Cir. 2011) (en banc). The Court must apply the standards for gateway actual innocence

13  claims set forth in *Schlup v. Delo*, 513 U.S. 298 (1995). *See McQuiggin*, 569 U.S. at 386. "[A]

14  petitioner does not meet the threshold requirement unless he persuades the district court that, in

15  light of the new evidence, no juror [or other trier of fact], acting reasonably, would have voted to

16  find him guilty beyond a reasonable doubt." *Id.* (quoting *Schlup,* 513 U.S. at 329).

17      " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v.*

18  *United States*, 523 U.S. 614, 623 (1998); *Calderon v. Thompson,* 523 U.S. 538, 559 (1998);

19  *Muth v. Fondren,* 676 F.3d 815, 819, 822 (9th Cir.), *cert. denied,* 133 S.Ct. 292 (2012). In order

20  to make a credible claim of actual innocence, a petitioner must "support his allegations of

21  constitutional error with new reliable evidence—whether it be exculpatory scientific evidence,

22  trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."

23  *Schlup*, 513 U.S. at 324.

24

1    Petitioner's contentions relate to the procedures surrounding the recording of his phone

2    conversations, but do not suggest the existence of any reliable new evidence which demonstrates

3    his actual innocence. *See Schlup*, 513 U.S. at 324. Rather than maintaining that he is actually

4    innocent, petitioner disputes the *sufficiency* of the evidence against him for his convictions of

5    rape, molestation, and incest. Petition argues that there was no authorization to search and seize

6    his telephone communications. Dkt. 6 at 5, 12, 21; Dkt. 15 at 6, 16. In his petition, petitioner

7    cites to the prosecution's lack of direct evidence linking him with the crimes charged. *See* Dkt. 6

8    at 5, 12, 21. (In grounds one, two, and five of his petition, petitioner contends that there were

9    insufficient applications for probable cause to intercept and seize recorded private telephone

10   communications and that police violated the warrant's authorization to intercept and record.).

11   However, a claim of legal insufficiency is not proof of "actual innocence." *See Bousley*, 523 U.S.

12   at 623. Petitioner has not shown that he did not have sexual contact with the victim but argues

13   that law enforcement submitted faulty and insufficient information for probable cause to

14   intercept and record petitioner's telephone conversations, which is insufficient to demonstrate a

15   claim of actual innocence. Dkt. 6 at 5; *See Terranova v. Ryan,* 2015 WL 3953888, at *1 (D. Ariz.

16   June 29, 2015) (finding no claim of actual innocence when the petitioner did not deny shooting

17   the victim but appeared to argue that the shooting was justified); *See Larsen v. Soto*, 742 F.3d

18   1083, 1096 (9th Cir. 2013) ("[W]e have denied access to the *Schlup* gateway where a petitioner's

19   evidence of innocence was merely cumulative or speculative or was insufficient to overcome

20   otherwise convincing proof of guilt."). In order to pass through the *Schlup* gateway, petitioner

21   must show that he did not commit the crime. Petitioner's argument is not sufficient.

22   In sum, petitioner's conclusory allegations of alleged actual innocence and arguments of

23   legal insufficiency are insufficient to establish even a prima facie gateway actual innocence

24

REPORT AND RECOMMENDATION - 16

1   claim under the exacting standard established by *Schlup*. *See Schlup*, 513 U.S. at 316; *Shumway*,

2   223 F.3d at 990. Accordingly, petitioner has failed to carry his burden of demonstrating that he is

3   entitled to equitable tolling based on actual innocence.

4          The Court recommends that the petition be dismissed with prejudice as time-barred.

5   Based on the foregoing, the Court declines to consider respondent's alternative arguments that

6   the petition is unexhausted and procedurally barred.

7                        **CERTIFICATE OF APPEALABILITY**

8          Petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

9   court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

10  (COA) from a district or circuit judge. A certificate of appealability may issue only if petitioner

11  has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. §

12  2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could

13  disagree with the district court's resolution of his constitutional claims or that jurists could

14  conclude the issues presented are adequate to deserve encouragement to proceed further."

15  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

16  (2000)). Pursuant to this standard, this Court concludes that petitioner is not entitled to a

17  certificate of appealability with respect to this petition.

18                               **CONCLUSION**

19         The Court recommends dismissing the petition with prejudice as time-barred. The Court

20  finds that it is not necessary to hold an evidentiary hearing and petitioner is not entitled to a

21  certificate of appealability.

22         Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

23  fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

24

6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on April 24, 2020 as noted in the caption.

Dated this 1st day of April, 2020.

J. Richard Creatura
United States Magistrate Judge